Ky Le
13430 SW Cougar Ct.
Beaverton, Oregon 97008
(310)897-1661
ky_le4342@yahoo.com

FILED 15 OCT '25 14:49 USDC-ORP

Plaintiff, Self-Represented Party

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| KY LE,<br><br>        Plaintiff,<br><br>V.<br><br>**CITY OF TIGARD**, an Oregon municipal corporation;<br>**SAMBO KIRKMAN**, acting under color of state law, in her individual capacity and in her official capacity as Community Development Director of the City of Tigard;<br>**DANELLE HAUTHER**, acting under color of state law, in her individual capacity and in her official capacity as Economic Development Director of the City of Tigard.<br><br>        Defendants | CASE #**3:25-cv-01521-AR**<br><br>**FIRST AMENDED**<br>**COMPLAINT FOR VIOLATION**<br>**OF CIVIL RIGHTS**<br>(42 U.S.C. § 1983; Compensatory and Punitive Damages Demanded)<br><br>JURY TRIAL DEMANDED |

**PARTIES**

# Parties

1. **Plaintiff:** Ky Le ("Plaintiff") is a resident of Washington County, Oregon. At all relevant times, he was the lessee-operator of the "Baller Park" food cart pod in the City of Tigard. Plaintiff brings this action under 42 U.S.C. § 1983 to redress the violation of his constitutional rights by Defendants. His contact information is 13430 SW Cougar Ct., Beaverton, OR 97008; (310) 897-1661; **ky_le4342@yahoo.com**.

2. **Defendant City of Tigard:** The City of Tigard ("City") is an Oregon municipal corporation located at 13125 SW Hall Blvd., Tigard, OR 97223. At all relevant times the City, through its officials and departments, was responsible for the policies, practices, acts, and omissions that gave rise to this action. This includes actions by the City's Community Development Department, Economic Development Department, and City Counsel which are City agencies whose decisions and directives represent official policy or final decision-making for the City in the context of Plaintiff's claims.

3. **Defendant Sambo Kirkman:** Sambo Kirkman is the Community Development Director of the City of Tigard, employed at 13125 SW Hall Blvd., Tigard, OR 97223. At all relevant times Defendant Kirkman acted under color of state law. She is sued in her individual capacity and official capacity as the City's Community Development Director.

4. **Defendant Danelle Hauther:** Danelle Hauther is the Economic Development Director of the City of Tigard, also employed at 13125 SW Hall

Blvd., Tigard, OR 97223. At all relevant times Defendant Hauther acted
under color of state law. She is sued in her individual capacity and official
capacity as the City's Economic Development Director.

# Jurisdiction and Venue

5. **Subject Matter Jurisdiction:** This Court has original jurisdiction under 28
   U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and
   laws of the United States. Jurisdiction is also conferred by 28 U.S.C. §
   1343(a)(3) and (a)(4) because Plaintiff seeks to redress the deprivation, under
   color of state law, of rights secured by the U.S. Constitution and to secure
   equitable and monetary relief under an Act of Congress providing for the
   protection of civil rights (42 U.S.C. § 1983). Plaintiff's claims present a
   federal question within this Court's jurisdiction.

6. Although Plaintiff list events and actions by Defendant violate state statutes,
   OAR administrative rules, DLCD state comprehensive plans Goal 1 and Goal
   9, Oregon Constitution, Plaintiff intention in this proceeding is how those
   actions or inactions directly and cumulatively was used deliberately to violate
   Plaintiffs Constitutional rights and guarantees for the purpose of limiting
   food carts and food cart PODs starting with Plaintiff who had the only stand
   alone food cart development.

7. Defendants Danelle Hauther (Economic Development Director) and Sambo
   Kirkman (Community Development Director) were final decisionmakers

within their respective departments for the acts described herein. In the alternative, their decisions were ratified by the City Council and/or City Manager, who possess final policymaking authority for the City of Tigard. Accordingly, the unconstitutional actions alleged herein represent official policy, custom, or practice of the City within the meaning of *Monell*.

8. **Venue:** Venue is proper in the District of Oregon (Portland Division) under 28 U.S.C. § 1391(b). The events and omissions giving rise to the claims occurred in this District, the property that is the subject of the dispute is located in this District, and all Defendants are located in and subject to personal jurisdiction in this District.

# Nature of the Case

8. This is a civil-rights action under 42 U.S.C. § 1983 compensatory and punitive damages, for violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights by the City of Tigard and its officials.

9. Plaintiff alleges that Defendants, acting under color of state law, deprived him of rights secured by the First, Fourth, and Fourteenth Amendment to the United States Constitution

10. Plaintiff had approvals based on the available application at the time he started his project. Plaintiff received an email that there was no limit on the amount of food carts on a property, and that there was no special permit required and that the food cart application in place was sufficient from City

Planner, Tina Tauson. The application required that Plaintiff obtain a
business license and approval from the owner of the property and city
planners that the property was zoned to allow food carts. Plaintiff worked
with city planner Gino Victoria on an application for landscape modification
to install concrete pads on the property to place food carts. Gino obtained
verbal approval from his superior allowing Plaintiff to start with 9 carts on
the front of property until he was able to obtain a wetland delineation report
to complete the project. Plaintiff therefore obtained approval under the
application the City had at the time. Plaintiff was told his project was
grandfathered in because he started his project prior to the March 2024 "3
cart rule". Plaintiff can show email verification that the business license was
acknowledged for the food cart POD and that Plaintiff was "approved" under
existing "policies and practices" e.g. *Gerhart v. Lake County*, 637 F.3d 1013,
1024 (9th Cir. 2011)) holds that a property interest requires a "legitimate
claim of entitlement" created by state law or policy.

11. **Plaintiff does not challenge the facial constitutionality of Tigard
    Ordinance 25-01 or related development codes.** Plaintiff does not
    challenge the facial constitutionality of Tigard Ordinance 25-01 or any
    related development code. Rather, Plaintiff challenges the motive, purpose,
    and implementation of those enactments, which were adopted and enforced
    as pretextual instruments to limit and/or extinguish food carts and food-cart
    pods within the City. Although the adoption of the ordinance also failed to

comply with certain state statutes, OAR requirements, and local procedural rules, the focus of this action is the purpose, effect, and enforcement of the ordinance—including Defendants' misuse of an unlawful "emergency" designation—which were not designed to advance public health, safety, or welfare, or to support small business, but instead to eradicate a disfavored economic class. Defendants moved food carts out of the "temporary use" framework and into the City's development code, then applied blanket System Development Charges (SDCs) to individual food carts as well as to multi-cart pods. Food carts, however, are self-contained vehicles with minimal impact on public infrastructure. Imposing SDCs on such uses amounts to double assessment, because the underlying properties had already been subject to SDCs when originally developed. Even the reduced blanket SDC rate of approximately $8,500 per cart (previously $13,500) is grossly disproportionate and shocks the conscience when compared to comparable Oregon jurisdictions. SDCs are intended for new construction and ground-up development, not for accessory or mobile uses that require no new infrastructure. The City's implementation of SDCs for food carts and pods was never approved by City Council nor subjected to public discussion or vote, further demonstrating that the charges lacked any legitimate legislative authorization. Most egregiously, Defendants designated food carts as requiring a Type-2 land-use process, the same procedure used for full-scale commercial developments. Under this scheme, a single-cart operator is now

required to submit site plans, neighborhood notices, traffic studies, and other documentation identical to that required of major restaurant developments such as an In-N-Out Burger. The process imposed delays of up to 120 days and vested final approval authority solely in Defendant Kirkman, the Community Development Director. This was not merely poor legislation or administrative error. Defendants weaponized the ordinance to eliminate those, including Plaintiff, who had lawfully invested in the food-cart industry. Despite repeated written notices, protests, and personal appeals from Plaintiff over the course of a year, the City's Mayor and Council ignored the obvious constitutional implications and took no corrective action. Although Defendants Kirkman and Hauther acted as final decisionmakers within their departments, the City's policymakers' deliberate indifference and inaction ratified their conduct. This pattern of conduct by Defendants Kirkman and Hauther was supported by City leaders—marked by coercive process, disproportionate unsupported emergencies, unheard of permitting processes, unjustified SDC for food carts financial exactions, and deliberate indifference to constitutional limits—constitutes an **abuse of governmental power so arbitrary and oppressive as to "shock the conscience,"** violating the Fourteenth Amendment's substantive due process guarantee as recognized in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), and *Crown Point Development, Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007).

12. **Abstention and Ongoing State Proceedings:** Plaintiffs' federal claims
(due process, First Amendment, takings, etc.) are outside LUBA's limited
scope, since LUBA reviews only state land-use law compliance and cannot
award damages or decide federal constitutional claims. Thus LUBA appears
inadequate for Plaintiffs federal issues. Under *Page v. King*, 932 F.3d 898
(9th Cir. 2019), Younger need not apply if the state forum is inadequate to
litigate federal constitutional issues. Here, LUBA is a purely state-law venue
and cannot remedy the asserted constitutional wrongs, suggesting Younger
should not bar Plaintiff's federal claims. As of the time of recording this
amended claim, Plaintiff's property interest and business have been
completely destroyed by Defendants' actions. Plaintiff purchase option is void
as the contractual date of execution has expired in Sept 2025. Since
Kirkman's Coercive letter to the Property owner, Plaintiff has ceased renting
space to food cart operators.  As of the date of submission of this amended
complaint, Plaintiff is in the final stages of vacating the property. Accordingly
no state administrative or appellate remedy remains available or adequate to
redress those injuries. Regardless, no doctrine of abstention deprives this
Court of the ability to adjudicate this case. Plaintiff is **not** asking this Court
to review or overturn any state court judgment, so the Rooker–Feldman
doctrine has no application. Although Plaintiff did file a related appeal with
the Oregon Land Use Board of Appeals 2025-018 ("LUBA") regarding
Ordinance 25-01, that proceeding is a limited legislative review and not a

state enforcement action. LUBA's review is confined to state land-use law issues and provides no forum for Plaintiff's federal constitutional claims or § 1983 remedies (LUBA cannot award damages or declare a city ordinance unconstitutional). Currently, the LUBA proceedings are still in progress. Plaintiff submitted his brief on Oct. 9th, 2025. Thus, there is no ongoing state **judicial** proceeding that can adjudicate the federal issues raised here. In any event, **Younger** abstention is also unwarranted. Younger v. Harris abstention applies only if the state proceeding is the type of quasi-criminal enforcement or civil proceeding that implicates important state interests and gives the federal plaintiff an adequate opportunity to raise federal constitutional challenges. Here, Plaintiff's LUBA appeal is not an enforcement action by the state, and that administrative forum cannot hear or grant relief on Plaintiff's constitutional claims. Because the state proceedings neither provide an adequate opportunity to litigate these federal issues nor involve any pending coercive enforcement against Plaintiff, the **Younger** criteria are not met. Furthermore, to the extent any state administrative process is ongoing, this federal action challenges the constitutionality of a municipal ordinance and seeks independent relief that will not "effectively reverse" any state tribunal's decision. This Court's intervention is necessary to afford complete relief on Plaintiff's federal claims and will not offend principles of comity or federalism under these circumstances.

13. Defendant Kirkman is the Director of Community Development. She is
responsible for drafting ordinance 25-01, directed the implementation of the
"emergency clause" and implemented herself as the sole approving authority
for food cart and food cart pods. Defendant **Sambo Kirkman**, as the City of
Tigard's Community Development Director, possessed final decision-making
authority concerning land use enforcement, permit policy regulation within
the City. Her determinations are binding on behalf of the City and not subject
to review or modification by any subordinate officer. Under the City's
governing framework, **only the City Council may appeal or reverse her
determinations**, and such review is discretionary and legislative in nature.
Accordingly, her actions constituted official City policy for purposes of 42
U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658
(1978).

14. Defendant **Danelle Hauther**, as Economic Development Director, likewise
exercised delegated policymaking authority in administering and enforcing
City business licensing. Her Coercive threats of withholding third party
business license of Plaintiffs cart tenants left Plaintiff with no appealable
options. Her actions were undertaken under color of state law and with the
express or implied authorization of the City Manager and City Council,
rendering the City of Tigard liable for her conduct pursuant to *Pembaur v.
City of Cincinnati*, 475 U.S. 469 (1986). In the alternative, and to the extent
either director's actions were reviewable, those actions were ratified and

adopted by the City Council and/or City Manager, thereby constituting
official municipal policy.

15. Defendant Hauther while having the ultimate authority to withhold business
license, she was not authorized, to make land use permit assessments, lead
discussion on the subject or threaten to issue violations. Additionally, she did
not have the experience or training to make such code determinations.

16. Defendants then retaliated against Plaintiff's protected activity of seeking
help from Tigard Council and filing state appeal against the legislative
enactment of ordinance 25-01. Interfered with his property and business
interests without due process of law, and applied newly enacted ordinances
retroactively to destroy Plaintiff's vested rights.

17. Plaintiff repeatedly informed the Mayor and City Council of the ongoing
constitutional violations, including the retaliatory enforcement actions and
lack of due process described above. These communications put City
policymakers on notice that Plaintiff's rights were being violated. In fact, the
Mayor personally acknowledged receiving emails in which Plaintiff described
the harassment and interference by City staff, yet neither he nor the Council
ever took any corrective action. This conscious failure to intervene despite
clear notice constitutes deliberate indifference to Plaintiff's rights and
amounts to ratification of the unconstitutional conduct. Such inaction by final
policymakers constitutes an official City policy of inaction, and courts
recognize that constitutional deprivations may result from the collective

inaction of a municipality's officials. Accordingly, the City's liability arises
under 42 U.S.C. § 1983 based on the City's own deliberate policy of inaction
and tacit ratification. Plaintiff's Monell claim rests on the City's deliberate
indifference – its own policy or custom – as well as the conduct of any
individual staff member such as Kirkman or Hauther.

# Factual Allegations

9. **Plaintiff's Food Cart Pod Project:** In September 2023, Plaintiff entered
   into a lease-purchase agreement to develop a food cart pod on property in
   Tigard, Oregon. Under this agreement, Plaintiff obtained a lease (with a
   15-year term) and an option to purchase the property for $850,000 within 24
   months. Plaintiff began operating "Baller Park," a food cart pod, on the
   property in 2023. His business plan was to host approximately 20-25 food
   cart vendors on site, generating rental income and building a community
   destination, then develop the property into a mixed use building in year ten.
   By late 2023, Plaintiff had invested substantial funds and effort into the
   property's infrastructure, including and not limited to (purchased 5 cart
   units, landscaping, seating, professional legal services, event promotors,
   marketing services, fencing, electrical panel upgrade and distribution, grease
   disposal, pads, etc.) and had recruited several food cart operators as tenants
   and was open for  business. Plaintiff can provide over $150k in receipts for
   remodel. This does not include Petitioners time or for general labor expenses.

Plaintiff operated under the current application process at the time which had no limit to the number of carts in a pod, SDC fees or development permitting process. Plaintiff applied for a permit for a landscape modification under available application requirements for a food cart POD and an approved use and secured a business license which required approval from the planning department.

10. Plaintiff secured preliminary interest from banks and private lenders prior to signing the agreement, At the time the City application process required, in part, zoning review, business license and property owner approval.

11. **City Assurances of No Cart Limit:** Before committing to the project, Plaintiff proactively consulted Tigard city planners about his plans. City planning staff explicitly told Plaintiff via email that there was *no numerical limit* on food carts in a pod, no special permit process or fees under then-existing regulations. Relying on these assurances, Plaintiff moved forward with confidence that he could expand Baller Park to 20 carts as planned. By early 2024, Baller Park was operating successfully with 3 food carts, while Plaintiff was in the process of completing wetland reports and a minor landscape modification. He had additional vendors lined up and was working with Washington County on approvals needed for new carts (such as health and safety permits).

12. Because of some potential wetlands on the back of the property, in April of 2024 Plaintiff sought approval to build nine (9) concrete pads on the front

half of the property as a phased development. Plaintiff started working with city planner "Gino" to put together a "site plan narrative" for a landscape modification needed for the pads. Gino seeked and received approval on the spot from his supervisor.

13. After the narrative was complete, Gino informed Plaintiff that the application was no longer needed as the ordinance changed the need for a permit for the pads.

14. In March, Gino issued a business license specifically acknowledging it was for Plaintiffs food cart POD.

15. **Attempted Imposition of an Undisclosed "Three-Cart" Rule:** In or around April 2024, while working with planners on a landscape modification application due to potential wetland issues, Plaintiff learned informally that the City was considering a policy to limit food cart pods to only three total carts. Alarmed, Plaintiff inquired how such a rule (if adopted) would affect Baller Park. Multiple Tigard planning officials assured Plaintiff that any new "three-cart rule" would **not** apply to Baller Park because his project was already in development and thus "vested." City staff indicated that Plaintiff's ongoing expansion would be grandfathered beyond any future cap. Plaintiff justifiably relied on these representations.

16. **Defendant Hauther's Coercive Tactics:** Despite those assurances, in September 2024, Plaintiff was invited to the City to discuss grand opening support with the assistant to Defendant Danelle Hauther (the City's

Economic Development Director). Immediately Hauther proclaimed Plaintiff
was "out of compliance".  Defendant Hauther stated that other than the 2
additional carts, Defendant was in compliance. Hauther stated there were no
applications available for more than 3 carts. Later after Plaintiff complained,
Hauther implied that a "three-cart" limit violation was imminent and
threatened that unless Plaintiff acceded to this five-cart cap, she would
refuse to issue business licenses to the 2 carts waiting for final health
inspections from the count. Plaintiff perceived this as a Coercive attempt to
lock his project into a permanently limited, nonconforming status. By capping
the pod at five carts, Defendants could later claim Plaintiff's use was **fixed**
and could not be expanded—effectively dooming the full 20-cart development.
Food cart PODs are reliant on having enough selections of food to become a
neighborhood hub. Anything less than 5 would be insufficient and would
breach Plaintiff's implied promise of 20 cart pod community to his lease
holders. Hauther had no clear authority or legitimate basis in the code to
impose this condition, which was unprecedented and not mandated by any
then-current ordinance or rule.

17. A Jan. 6th record of planning commission review of the ordinance shows that
    the City knew that the "3 cart rule" did not regulate PODs and Plaintiff had
    significantly invested in his project.

18. **Plaintiff Refused to Submit to Coerced Limitation:** Recognizing the
    trap, Plaintiff refused to file the requested Temporary Use application for a

five-cart pod, Plaintiff instead submitted an application for his 20 food cart

pod. In which Plaintiff believed he would then be able to appeal. Instead

Defendants ignored the application, denying him a formal, appealable

decision. Instead of processing Plaintiff's pending site plan or issuing an

official decision or violation, City staff stalled and kept Plaintiff in

bureaucratic limbo for the four months leading up to Jan. ordinance adoption.

19. On or about Nov 7th, 2024, Plaintiff met with Defendants Hauther and

Kirkman at City offices to discuss Baller Park's future. Rather than address

Plaintiff's rights or explain any prior approvals no longer applied, Defendants

again insisted that he agree to limit the pod's size. Defendant Kirkman

(Community Development Director) joined Hauther and was immediately

hostile in pressuring Plaintiff to submit an application for only two additional

carts (capping the pod at five). During this meeting, Defendants raised two

minor code violations at the site (previously unnoticed issues) as leverage,

insinuating that Plaintiff's project was in jeopardy. Plaintiff viewed these

alleged violations as pretextual excuses to justify the City's stance. Although

there were two senior planners present, including the one that gave Plaintiff

authority for 20 carts, Hauther led the meeting, asserting code violations,

again without authority or experience and without explaining why the

previous planners' approvals were not authorized. Defendant Hauther backed

by Kirkman, repeated her ultimatum: accept the reduced number of carts via

the temporary use permit process or face indefinite delay and possible

enforcement. Plaintiff again declined to surrender his development rights. Although there were 2 experienced planners at the meeting Defendant Hauther led the meeting with Kirkman playing an enforcer role.

20. He later asked Kirkman to at least issue a written determination or decision denying his full build-out, so that he could pursue an appeal. Kirkman refused stating there were no applications available for food cart PODs. After the meeting, City staff sent Plaintiff an email reiterating that no further licenses would be approved for new carts unless Plaintiff complied and submitted the limited application as directed. It adapted to the new violations. This email struck Plaintiff as coercive and punitive.

21. From Sept 17th, 2024 til Jan 28th, Plaintiff pleaded with Kirkman, City Mayor, City Counsel, state representatives. Plaintiff documented how he had lost his vendors and the effect of the retroactive application on the losing of his vendors.

22. For 4 months, Defendant Kirkman and City members were silent on development of a food cart pod ordinance.

23. On Jan. 28th, 2025, three hours prior to the hearing, Plaintiff was alerted that there was a hearing to "discuss" food cart PODs. Plaintiff attended hoping to meet other food cart and POD operators. He was surprised to see an empty room. Plaintiff spoke at the public comment section of the hearing not knowing there would be a vote on the ordinance.

24. **Ordinance 25-01 – Emergency Legislation** After secretly developing the
    new ordinance without giving any notice to those affected as required by,
    City staff took the issue to the Tigard City Council. On January 28, 2025, the
    Tigard City Council enacted *Ordinance No. 25-01*, which amended the Tigard
    Municipal Code adding a food cart and food cart POD section. Plaintiff
    attended the January 28 Council meeting (by happenstance, having learned
    of it informally) and witnessed staff's presentation.

25. At the hearing, Kirkman's assistant, Schuyler Warren presented the
    ordinance and a need for an emergency was for the benefit of food cart
    entrepreneurs.

26. This ordinance was presented and passed as an "emergency," meaning it took
    effect immediately upon passage and was not subject to the usual 30-day
    waiting period (which would have allowed for a voter referendum). In
    advocating for emergency adoption, Planner Warren made several factual
    representations to the City Council that Plaintiff alleges were false or
    misleading. For example, Warren claimed an emergency need for the
    ordinance due to a high volume of pending food cart applications and
    concerns about infrastructure (like grease disposal from carts). In reality, at
    that time **there were no pending new food cart applications in Tigard**
    and no evidence of any immediate public health or safety crisis. In fact, the
    planner admitted the issues with FOG were regulated by county Clean Water

Services.  Warren even admitted during the hearing that "there's never an emergency in planning"

27. Later at a food cart information hearing, held retroactively, seemingly to give the affected developers their chance for a hearing. Acknowledged he knew about Plaintiff and the other POD owners prior to the ordinance adoption. Warren acknowledged meeting with the other cart pod development. And Kirkman stated that the "emergency" label was "Not an Emergency" but it was a bureaucratic convenience and a "tool she can use when she wanted the ordinance to take effect sooner than the 30 days. **Retroactive Application to Plaintiff's Vested Project:** Ordinance 25-01, by its terms, applied to "new" food cart pods or expansions not already finally approved. Despite prior assurances that Baller Park would be exempt as an existing development, Defendants immediately took the position that Plaintiff's expansion plans were subject to the new three-cart cap. In other words, Defendants treated Baller Park as a "new" pod that could not exceed three carts total, effectively freezing Plaintiff's project at its then-current size. Plaintiff received no advance personal notice that Ordinance 25-01 was being proposed to City Council, nor any invitation to be heard in the legislative process. He and other food cart pod operators were caught by surprise. The use of the emergency clause meant the ordinance took effect *instantly*, leaving no 30-day window for Plaintiff or community members to refer the matter to Tigard voters.

28. **Lack of Legitimate Justification for Emergency Clause:** Plaintiff

   contends that the "emergency" passage of Ordinance 25-01 was a deliberate

   strategy by Defendants to thwart any appeal or public challenge. By invoking

   an emergency and eliminating the normal effective-date delay, Defendants

   intentionally prevented opponents from organizing a referendum to overturn

   the ordinance. From Plaintiff's perspective, there was no bona fide emergency

   – the ordinance was rushed through primarily to solidify the three-cart rule

   before Plaintiff could obtain any vested rights or seek judicial relief. Internal

   City communications (revealed to Plaintiff or stated on the record) indicated

   that City staff portrayed a sense of urgency based on fictitious circumstances

   (e.g., nonexistent backlog of cart applications). City staff also failed to

   disclose to Council that at least one substantial food cart pod project

   (Plaintiff's) was already underway and would be adversely affected. In fact,

   when a Councilmember inquired about existing pod developments that might

   be grandfathered, a planner (Mr. Warren) falsely stated he was "not aware of

   any" such projects—even though Plaintiff's ongoing Baller Park project was

   well known to the planning staff. This should have raised a red flag as to the

   need of an emergency.

29. **No Meaningful Notice or Hearing for Plaintiff:** Plaintiff was denied any

   meaningful opportunity to voice his concerns or protect his interests before

   Ordinance 25-01 was enacted. The City did not provide mailed notice to

   property owners as required by state statute, DLCD administrative rules and

city procedures prior to the Council hearing, even though the ordinance
functioned to downzone or limit uses of specific ongoing enterprises. By the
time Plaintiff learned the ordinance was on the agenda (through a
last-minute informal tip), the emergency ordinance was already drafted and
poised for approval.

30. **Plaintiff's Response – Seeking Administrative and Legal Relief:**. In
Feb. 2025, Plaintiff filed a land use appeal with the Oregon Land Use Board
of Appeals ("LUBA"). This LUBA petition (No. 2025-018) challenged the
City's actions—lack of notice, initiation of an emergency enactment—as
violative of Oregon land use laws and regulations. Plaintiff in the LUBA
appeal did not challenge the constitutionality of the ordinance on it's face and
because there were no formal violations or permit denials directed at Plaintiff
(just vague threats), the LUBA appeal is not a challenge to how it was
applied to Plaintiff.

31. **Ordinance 25-01's Impact on Food Cart Development (The smoking
gun):** Ordinance 25-01 amended Tigard's code to require not only any new
food cart pods (or expansion of an existing pod) but stand alone food carts, to
go through a Type II land use application limited to three carts. This Type II
process vests broad discretion in the Community Development Director
(Defendant Kirkman) to approve or deny the application. The new
regulations imposed onerous requirements on food cart pods akin to those for
permanent developments: e.g., costly site improvements, payment of

substantial system development charges (around $13,500 per cart plus permitting fees), neighborhood notice and possibly hearings, and up to 120 days for a decision. In short, Ordinance 25-01 erected significant financial and procedural hurdles that made independent food carts not just food cart pod development economically unviable for all but the smallest (3-cart) operations. Plaintiff alleges that City officials were simultaneously promoting the City's own municipally-sponsored food cart site ("Universal Plaza") as a showcase for small business development, while using Ordinance 25-01 to **freeze out** private competitors like Plaintiff's pod (which had attracted considerable interest from vendors). The result of the ordinance's implementation was that, as of nine months post-enactment, no new food cart pod had been approved or established in Tigard. Plaintiff's project, in particular, was left in a state of limbo and stagnation.

32. **Defendants retaliatory harassment :** Following Plaintiff's notice of Appeal, City officials Kirkman and Hauther began appearing at Baller Park without notice or invitation. Two of the heads of Tigard departments personally visiting a site that was mostly closed with only one cart that was randomly open, three days in a row seems arbitrary and without legitimate reasons. If one existed it would seem to be more explainable if a city inspector came out instead. In late 2024, prior to Plaintiff's first meeting with Defendant Hauther, she herself made unannounced visits to the property, ostensibly to look for code violations, despite such inspections not being

within her normal job duties. Then, after Plaintiff filed his LUBA appeal

2025. Defendants escalated these tactics. On April 15, 16, and 17, 2025,

Defendant Kirkman, Defendant Hauther, and another City employee

(identified as Schuylar Warren, an assistant planner) **each day** surveilled

Baller Park in City vehicles without providing notice, consent or justification.

These visits were conspicuous and intimidating: officials roamed the

perimeter of the premises, on at least one of the visits at a time the POD was

closed and then left without substantive comment when Plaintiffs staff

approached. When Plaintiff complained to the City's risk management

department and the City Attorney about these intrusions, the direct visits by

Kirkman and Hauther stopped. However, shortly thereafter, other

government personnel began showing up at the site (including Tigard Public

Works and Washington County Health inspectors), citing vague reasons. The

timing and frequency (multiple consecutive days) strongly suggested these

"inspections" were orchestrated in retaliation for Plaintiff's stance. Plaintiff

experienced these incursions as harassment aimed at chilling his efforts to

expand Baller Park and to seek redress.

33. Additionally, City officials took the unusual step of bypassing Plaintiff, his

only operator and contacted his landlord (the property owner) directly. The

City sent correspondence to the landlord without mention of Plaintiff, that

the landlord  himself was in violation of not have a land use permit for a food

cart POD and urging the landlord to "ensure compliance." This was seen as

an attempt to pressure Plaintiff indirectly—by threatening his leasehold or inducing his landlord to act against him—because Plaintiff tried to restart his POD, with only one cart open at the time. Such back-channel coercion is not a normal or authorized enforcement method; rather, it evidences Defendants' intent to retaliate against and intimidate Plaintiff for asserting his rights.

34. **LUBA Appeal Proceedings:** The City of Tigard responded to Plaintiff's LUBA appeal by moving to dismiss it, arguing that Plaintiff lacked standing to appeal the ordinance. In doing so, City staff even misrepresented facts to the LUBA judges—falsely suggesting that Plaintiff had not participated in the City Council hearing and thus could not qualify as an adversely affected party. In reality, Plaintiff was present at the hearing and did speak, which the City's own records reflected. LUBA denied the City's motion to dismiss, affirming that Plaintiff did have standing. The LUBA appeal then proceeded to briefing on the merits. As of the filing of this First Amended Complaint, **LUBA has not yet issued a Final Opinion and Order** in case No. 2025-018; the appeal remains pending.

35. For Plaintiff the appeal no longer serves as a remedy. The purchase date has expired and the letter attacking the property owner made any other attempts to hold onto the POD futile. Currently, Plaintiff is cleaning up the property to return to the owner. Any final LUBA decisions are subject to judicial review in the Oregon Court of Appeals (see ORS 197.850), and are

not a remedy to Plaintiff. Regardless, Plaintiff emphasizes that the claims in this federal lawsuit are distinct: LUBA's jurisdiction is limited to state land use issues, and it cannot grant the relief sought here (such as damages or declarations of federal constitutional rights).

36. **Plaintiff's Tort Claim Notice:** In addition to the LUBA appeal, Plaintiff served the City of Tigard with a formal Tort Claim Notice pursuant to ORS 30.275 on April 21, 2025. This notice informed the City of Plaintiff's intent to pursue legal claims arising from the City's conduct, including coercion, fraud, retaliation, and due process violations. The City was therefore on notice of Plaintiff's grievances and had an opportunity to address them prior to litigation, but no resolution was offered nor did it stop Defendants harassment.

37. **No Adequate Alternative Remedies:** Despite Plaintiff's diligent efforts to seek relief through administrative channels and state procedures, **no adequate remedy exists** to address the constitutional harms at issue. Because no violations or letters of determinations were applied, Plaintiff was not given any clear paths to Due Process. Plaintiffs' emails to City Counsel were not returned and attending the 2 minute community input where Council members were not permitted to ask questions was not sufficient avenues. It is clear that Defendants knew that the alleged violations limiting 3 carts were not lawful and that a violation would trigger an appeal in front of Council. LUBA's review is confined to whether the City's ordinance and

actions comply with Oregon land use laws; LUBA lacks jurisdiction to decide federal constitutional claims or to award compensation for constitutional violations. Similarly, any state court review of the ordinance (through a LUBA appeal or otherwise) would not encompass the damages or federal claims that Plaintiff brings here. In short, Plaintiff has been left without any forum, other than this Court, capable of vindicating his U.S. Constitutional rights and providing full relief. Accordingly, Plaintiff now brings this § 1983 action to obtain that relief.

38. **Injuries to Plaintiff:** As a direct and proximate result of Defendants' actions described above, Plaintiff has suffered substantial harm. Defendants' conduct has derailed a significant entrepreneurial venture, causing Plaintiff severe financial losses, frustration of use of his property interest, and the loss of business relationships and opportunities. Plaintiff has also endured emotional distress and a chilling of his willingness to engage with local government, after experiencing retaliation for doing so. These injuries are ongoing and will be irreparable absent relief, because the ordinance continues to block Plaintiff's project and Defendants have given no indication of remedying the situation. Plaintiff's damages and losses are further detailed in the Causes of Action and Prayer for Relief below.

# Claims for Relief

*(All claims below are asserted via 42 U.S.C. § 1983 against Defendants acting under color of state law. Each claim incorporates by reference all preceding paragraphs.)*

## Count I: Violation of Fourteenth Amendment – Procedural Due Process

*(Against All Defendants)*

27. **Equal Protection (Fourteenth Amendment)** Plaintiff was the only operator of a stand-alone food-cart pod development within the City of Tigard. The other two food-cart pods were accessory uses to existing commercial properties with established tenants and buildings. Plaintiff alleges that Ordinance No. 25-01, specifically TDC 18.750.020(b)(2)(d) ("The food cart pod has been in continuous operation with no interruption of operations of more than 30 days"), was drafted and enacted with the deliberate purpose of targeting Plaintiff's operation specifically. Between September 2024 and January 2025, Defendants knew that Plaintiff had lost all but one of his food carts due to the City's coercive actions and interference. By including the 30-day "continuous operation" clause, Defendants ensured that only Plaintiff—and no other pod operator—would fail to qualify for any "nonconforming use" exemption. This clause was never applied to any other food-cart pod and was unnecessary, given the simultaneous "emergency" adoption of the ordinance, or would be necessary to be applied to any future pods. After the ordinance's enactment in January 2025, Defendants indeed

enforced this uniquely punitive clause against Plaintiff. A subsequent letter
in June from the City to Plaintiff's landlord falsely asserted that the property
was "not approved for food carts," effectively precluding continued operation
and extinguishing Plaintiff's rights. During this period, the other two
food-cart pods—each located on commercial parcels—retained their tenants
and remained unmolested by enforcement actions. Defendant Kirkman, the
City's Community Development Director, was fully aware of Plaintiff's
diminished operations and the discriminatory effect of the 30-day clause but
enforced it regardless. This selective drafting and enforcement of Ordinance
25-01 constitute intentional differential treatment of Plaintiff as compared to
other similarly situated food-cart pod operators. Defendants' actions lacked
any rational basis and were motivated by animus and retaliatory intent.
Such conduct violates the Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution.

28. **Arbitrary and Retaliatory Use of SDC Fees to Eliminate Food**

   **Carts.** Defendants misused their authority to impose System Development
   Charges (SDCs) not as legitimate cost-recovery tools, but as instruments of
   economic suppression directed at Plaintiff and similarly situated food cart
   operators. SDCs are intended to offset the proportional impact of new
   development on public systems. Plaintiff's existing and permitted use did not
   create any measurable new burden, yet Defendants invoked SDC fees to
   block Plaintiff's expansion and effectively terminate operations. But the "

"smoking gun", was that a stand alone operator of a food cart was also required the same type 2 process and unknown SDC fees. This inexplicitly shows Defendants' true objective was not to recover infrastructure costs but to eliminate food-cart pods by restricting food carts. By weaponizing SDC fees and type 2 processes for food carts to coerce closure of lawfully established businesses, Defendants acted with deliberate indifference to constitutional limitations and without any rational relationship to public health, safety, or welfare. Collective all the actions and the Counsel and Mayors complicit response to Defendant's conduct constitutes an abuse of governmental power so arbitrary and oppressive as to shock the conscience, in violation of the Fourteenth Amendment's substantive due process guarantee, as recognized in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998); *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007); and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

29. **Property Interests at Stake** The Fourteenth Amendment to the United States Constitution prohibits state actors from depriving any person of life, liberty, or property without due process of law. To invoke procedural due process, a plaintiff must possess a constitutionally protected property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564 (1972). Plaintiff and other food-cart pod owners possessed several property interests requiring notice and procedural safeguards under state law, including but not limited to:

(a) a valid and enforceable **purchase contract** for the property;

(b) a **City-issued business license** authorizing operation of a food-cart pod under the prior development framework that contained no numerical limit on carts;

(c) **entitlements and approvals** created through reliance on City representations that Plaintiff was "permitted" to develop a 20-cart pod;

(d) **contractual and economic relationships** with multiple food-cart vendors who committed to lease or operate within the pod; and

(e) **investor and lender interests** tied to the project's approved scope and business plan. Plaintiff's investment and operational reliance on these interests were **reasonable and investment-backed expectations**, reinforced by the City's prior assurances and course of conduct. These interests constitute more than a unilateral expectation; they are **legitimate claims of entitlement** grounded in Oregon law and established municipal practice, recognized as protected property interests under *Gerhart v. Lake County*, 637 F.3d 1013, 1024 (9th Cir. 2011). Once created, such property interests are protected by the Due Process Clause and **cannot be revoked or impaired arbitrarily or without adequate notice and opportunity to be heard.** Defendants' subsequent actions—revoking approvals, coercing compliance, and enforcing new restrictions without notice procedure—constituted a **deprivation of property without due process of law** in violation of the Fourteenth Amendment.

30. **Deprivation Without Process:** Defendants deprived Plaintiff of these property interests, effectively and abruptly, without providing constitutionally sufficient notice or procedure. Starting with the Coercive tactics Defendant Hauther, without warning, or a way to appeal because no violation was ever given, Plaintiff was hit with unforeseen "taking" of his project. Hauther at first stated there were no applications available for more than the 3 carts. When Plaintiff told Defendant to issue a violation, Hauther retaliated by threatening to not issue business licenses. Holding 3rd party business licenses unless Plaintiff filed a modification application that would limit his development to 5 carts total is Coercive. Hauther did not have the authority or the experience to make planning or permit assessment but under the color of law attempted to restrict and deprive Plaintiff of his rights to Due process and full use of the property and vested rights authorized by Plaintiffs business license to operate a 20 plus food cart POD.

31. **Retroactive Enforcement of New Rule:** Imposing and threatening violation of a prior "three-cart limit" (via Tigard Made Ordinance 24-05) against Plaintiff's project, despite earlier City assurances that no such cap would apply and despite Plaintiff's project being already underway and ostensibly vested. This retroactive application nullified Plaintiff's prior *de facto* approval to expand and stripped him of the value of his lease and business plans, all **without any pre-deprivation hearing or individualized process**.

32. **Coercive Withholding of Permits:** Threatening to withhold, and indeed withholding or refusing to process, necessary licenses and permits for Plaintiff's additional vendors unless he acceded to Defendants' demands (such as filing a restrictive temporary use application). This amounted to an ultimatum delivered administratively, **without due process**, as Plaintiff was denied any formal avenue to contest the withholding of approvals.

33. **Secret Rulemaking and Lack of Notice:** Developing the food cart cap ordinance behind closed doors while misleading Plaintiff that no such regulation was imminent, then enacting Ordinance 25-01 as an "emergency" measure with no direct notice to affected parties (like Plaintiff) and no meaningful opportunity for them to be heard. The usual legislative process safeguards were bypassed, and Plaintiff was essentially **ambushed** by a law tailor-made to undermine his rights.

34. **Denial of Administrative Appeal Mechanisms:** Refusing to issue a written decision or letter of code interpretation when Plaintiff requested one (after the City stalled his 20-cart site plan application). By withholding any official decision on his application or status, or even issuing violations, Defendants prevented Plaintiff from accessing Oregon's normal land use appeal process at the local level. This deliberate procedural **stonewalling** left Plaintiff with no notice of a final decision and no local hearing or appeal to challenge the deprivation of his development rights.

35. **Emergency Clause Abuse:** Utilizing an emergency ordinance to eliminate
the 30-day referendum period, thereby cutting off Plaintiff's state-law right
to refer or challenge the ordinance through democratic means. While
legislating via emergency is allowed in genuine crises, here it was employed
in bad faith to deprive Plaintiff (and similarly situated citizens) of an
important procedural check and the opportunity to overturn the law before it
took effect. Kirkman admitted at the later food cart information hearing, that
no emergency existed, that it was a tool she can use when wanting to
implement an ordinance earlier than the 30 days. The vague reference to
Fats, oil and grease was not substantiated on the face of the ordinance, gave
no reference to an emergency for the health and safety of the public and was
admittedly the responsibility of the County's Clean Water Service.

36. **End-Run via Landlord:** Sending a directive to Plaintiff's landlord in an
effort to enforce compliance indirectly, which bypassed the normal procedure
of notifying the actual party in interest (Plaintiff). By attempting to enforce
the new restriction through private pressure rather than transparent legal
process, Defendants deprived Plaintiff of any forum to defend his rights
before the deprivation occurred.

37. **Unannounced Inspections and Interference:** Defendants can not justify
why repeated site visits from 2 of the city's highest ranking officials were
needed when the POD was not even open. Defendants repeatedly visited
Plaintiff's premises without notice or authority, even if under the guise of

finding code violations, without documentation interfering with Plaintiff's
use and quiet enjoyment of his leasehold. These visits were not part of any
formal proceeding or process; Plaintiff had no opportunity to object or be
heard regarding these intrusions, which were done to intimidate and gather
evidence *ex parte.*

29. **Lack of Meaningful Hearing:** At no point did Defendants afford Plaintiff
or similarly situated developers any notice or a meaningful hearing or
adjudicative process to contest the severe restrictions placed on their
property interests. The ordinance was adopted legislatively, but even then,
Plaintiff (and other affected owners) were not properly notified or heard. No
mailings went out. No local newspaper listings of ordinance hearings. After
the ordinance's passage, **ORS 197.615(4)(a) requires notice sent to those
who participated at the Jan 28th hearing.**

30. All of Defendants' enforcement and implementation actions were unilateral:
Plaintiff was never given notice and an opportunity *before* his project was
stymied to argue that his development should be allowed or that he had
vested rights. Even when he filed an appeal with LUBA as a last resort, that
forum does not provide a full evidentiary hearing for federal constitutional
grievances, nor could it stop the City from enforcing the ordinance in the
meantime. In sum, Defendants deprived Plaintiff of his property interests
first, and only **afterwards**—if at all—would he even potentially get review,
which is contrary to the core due process requirement of a hearing "at a

meaningful time and in a meaningful manner" before significant
deprivations.

31. **Violation of Procedural Due Process:** Defendants' conduct, as described,
violated Plaintiff's right to procedural due process under the Fourteenth
Amendment. The combination of no notice, no timely hearing, and the use of
coercive backdoor methods to enforce a new rule rises to a constitutional
violation. Fundamental fairness was lacking: a reasonable property owner in
Plaintiff's position would expect, at minimum, clear notice of any rule change
affecting existing developments and an opportunity to object or seek an
exemption before being forced to downsize a project in mid-course. By
depriving Plaintiff of his property rights through legislative fiat and
administrative strong-arm tactics—without adhering to the procedural
safeguards that normally accompany such deprivations—Defendants acted
under color of law to deny Plaintiff due process of law.

32. **Damages:** As a direct and proximate result of the foregoing due process
violations, Plaintiff has suffered and continues to suffer substantial injuries.
He has been prevented from realizing the value of his lease and option, lost
expected profits and business opportunities, and incurred financial losses
from wasted investments. He also suffered reputational harm with vendors
and investors (who saw his project halted by City action) and experienced
distress and uncertainty from the City's arbitrary treatment. Plaintiff is
therefore entitled to recover compensatory damages for these harms. He also

seeks appropriate equitable relief to undo or mitigate the effects of

Defendants' procedural violations, and pursuant to 42 U.S.C. § 1988, Plaintiff

is entitled to an award of his reasonable attorney fees and costs if he prevails.

# Count II: Violation of Fourteenth Amendment – Substantive Due Process

*(Against All Defendants)*

32. The Fourteenth Amendment also guarantees substantive due process, which

protects individuals from arbitrary or egregious exercise of government power

even where procedural protections are present. Substantive due process is

violated by official conduct that *shocks the conscience* or interferes with rights

in a manner so unjustified that it cannot be rationally related to a legitimate

governmental interest. In the land-use context, while local governments have

broad leeway to regulate for public welfare, their actions must still have some

legitimate purpose and *rational basis*. A regulation or act that is motivated

by bias, personal animus, or a desire to harm a particular individual, rather

than to serve the public, is arbitrary and capricious and can violate

substantive due process. Likewise, a law that is passed under false pretenses

or through fundamentally unfair means can implicate substantive due

process, as it fails to *substantially advance* any valid state interest (a classic

substantive due process inquiry per the Supreme Court).

33. **Conscience-Shocking Conduct:** Defendants' course of conduct was intentional to not only destroy Plaintiff and others Food Cart Developments but was meant to freeze out food carts, not just food cart PODs with a type 2 process meets this high threshold. Taken together, the actions of Defendants Kirkman, Hauther, and the City were not mere errors in judgment but deliberate, oppressive measures intended to target Plaintiff's project and force it out of business for reasons unrelated to any legitimate public harm from having more than three food carts. The following aspects of Defendants' conduct demonstrate its arbitrary and conscience-shocking nature:

- The city planners at the early stages were consistent, no cart limit, SDC fees or burdensome permitting and then Defendants Kirkman and hauther did the opposite, retroactively yanking away Plaintiff's and others rights as soon as it became politically expedient. This betrays a fundamental unfairness and *bait-and-switch* against Plaintiff that a civilized government should not practice.

- Defendants Hauther and Kirkman wielded regulatory power as a bludgeon to coerce Plaintiff, making baseless threats (withholding licenses) and manufacturing code violations against property owners to gain leverage. The City's economic development director had no business or authority conducting surprise "inspections" of Plaintiff's site in search of infractions and using them to coerce compliance that was not required; that she did so underscores the bad faith at play.

- The true motive behind Ordinance 25-01 was not the neutral application of land use policy, but to **stop Plaintiff specifically**. City officials were aware that Plaintiff's expansion was underway and would compete with or complicate the City's own agenda (such as promoting the City-run Universal Plaza project and restaurants in Tigard downtown). By rushing the ordinance through under false pretenses, Defendants hijacked the legislative process to accomplish an improper objective. **Emergency powers** were invoked where no real emergency existed – a tactic that demonstrates oppressive intent. Misleading the City Council (e.g., about nonexistent pending applications and ignoring Plaintiff's presence) shows the depth of Defendants' willful misconduct.

- Defendants' actions were **highly selective and targeted**. They did not engage in a good-faith, generally applicable enforcement of neutral rules; instead, they crafted and enforced rules in a way calculated to harm Plaintiff's particular business. For instance, City staff ignored other potential "pod" developments in discussion with Council and tailored the ordinance so that it would catch Plaintiff's project. This kind of purposeful discrimination and vindictiveness — essentially singling out Plaintiff for adverse treatment — lacks any legitimate justification.

- The cumulative nature of Defendants' harassment (coercive meetings, refusal to put decisions in writing, guerrilla-style inspections, pressure on the landlord, etc.) reveals an intent not to govern, but to punish and deter

Plaintiff. Even after passing the ordinance, Defendants piled on with site
visits and intimidation purely because Plaintiff exercised his right to appeal.
Such retaliation is **unrelated to any valid land use enforcement goal**
and indeed contravenes the basic norms of governance. It reflects personal
animus and a punitive mindset by Defendants, which is the antithesis of
rational decision-making.

- The result of Defendants' conduct was to destroy the value of Plaintiff's
  investment and business expectations, essentially **nullifying** his property
  rights, without serving any legitimate public interest. The supposed public
  purposes cited (like preventing grease issues or helping small vendors) were
  pretextual and unsupported by facts. In reality, limiting pods to three carts
  does not credibly advance public health, safety, or welfare in a city already
  permitting food carts; it merely protects certain interests or aesthetics at the
  expense of Plaintiff's rights. An irrational or wholly arbitrary law, or one that
  is predicated on dishonesty, cannot survive substantive due process scrutiny.

34. **Absence of Legitimate Basis:** Defendants will likely assert that Ordinance
    25-01 serves some legitimate city interest (such as manageable development
    or preventing infrastructure strain). However, even under deferential
    rational-basis review, the circumstances here indicate that the ordinance and
    its enforcement against Plaintiff were **irrational and arbitrary**. The
    emergency clause's misuse is telling: had there been a genuine public
    exigency, it would be documented and real. Instead, Defendants invoked an

emergency as a strategy to avoid scrutiny. Moreover, the actual effect of the ordinance was economically and competitively protective (shielding brick-and-mortar restaurants or the City's own project from competition, perhaps) rather than protective of public welfare. A law driven by protectionism or animus is not a valid exercise of police power. Further, the manner in which Defendants enforced the cap – giving Plaintiff no grace or grandfathering despite his reliance – shows that fairness and proportionality were thrown out the window. In substantive due process terms, **Defendants' actions bore no reasonable relation to a conceivable legitimate purpose**, and thus were arbitrary in the constitutional sense.

35. **Violation of Substantive Due Process:** By engaging in the above-described conduct, Defendants deprived Plaintiff of his rights to property and liberty (to use and develop his land, to pursue his occupation, and to be free from government harassment) in a manner that is so egregious and unjustifiable that it violates substantive due process. Defendants' campaign against Plaintiff "shocks the conscience" and represents an abuse of power that federal constitutional law prohibits. Even if some individual component of their conduct might be cloaked in legal form (e.g., passing an ordinance, conducting an inspection), the **totality and context** reveal a plan to oppress a single citizen for daring to challenge City officials. This exceeds the bounds of lawful government action. The arbitrary retroactive rule, the calculated denial of any fair process, and the vindictive enforcement efforts

together amount to an unlawful deprivation of Plaintiff's property and liberty
interests under the Fourteenth Amendment's substantive guarantee.

36. **Damages:** As a direct result of Defendants' arbitrary and
conscience-shocking actions, Plaintiff suffered harms overlapping with those
in Count I: loss of property value and opportunities, lost profits and contracts,
and significant emotional distress (including the strain of being targeted by
City officials). These damages were not the result of a normal regulatory
burden but of deliberate and improper conduct, warranting full
compensation. Additionally, because Defendants acted with malice or in
reckless disregard of Plaintiff's rights, an award of punitive damages against
the individual Defendants (in their personal capacities) is appropriate to
punish and deter such misconduct. Plaintiff also seeks his attorney fees and
costs under 42 U.S.C. § 1988 for this claim.

## Count III: Violation of the First Amendment – Retaliation

*(Against All Defendants)*

37. **Protected First Amendment Activity:** The First Amendment to the U.S.
Constitution, applicable to state and local governments via the Fourteenth
Amendment, protects the rights to free speech, to petition the government for
redress of grievances, and to freely associate. This means that public officials
cannot punish or retaliate against an individual for speaking out or seeking
relief from government actions. At all relevant times, Plaintiff was engaged

in protected First Amendment activity. He communicated with City officials, both in person and through letters and emails, to complain about the handling of his project and to urge the City to follow the law. He spoke at public meetings (including attempting to speak at the January 28, 2025 Council meeting) and contacted City leadership (the Mayor and Council members) to voice opposition to the emergency ordinance and the lack of fair process. He also filed formal petitions for redress: specifically, his LUBA appeal challenging Ordinance 25-01 was an act of petitioning the government through lawful channels. These actions—voicing his perspective, challenging officials' narratives, and invoking legal remedies—are at the core of what the First Amendment protects.

38. **Adverse Actions by Defendants:** Defendants, acting under color of state law, took a series of adverse actions against Plaintiff in direct response to his protected expression and petitions. After Plaintiff began resisting Defendants' demands in late 2024 and escalated his complaints (including raising legal objections and preparing to appeal), Defendants' treatment of him notably worsened. The adverse actions included:

- **Withholding Approvals:** Defendants stalled and ultimately refused to process Plaintiff's application for expansion solely because he would not "voluntarily" limit his project and because he continued to press the City for explanations. In effect, Defendants imposed a bureaucratic embargo on

Plaintiff's project, which would discourage any person from continuing to protest.

- **Implementing aspects of Ordinance 25-01 Specifically to Halt Plaintiff:** The timing and manner of the ordinance's enactment of subsection limited 30 day loss of cart designation indicate it was, at least in part, motivated by animus toward Plaintiff's persistence. Staff rushed the law through after Plaintiff refused to back down, and they tailored it to retroactively impede him. Passing a law to penalize a vocal critic or to squash the efforts of someone petitioning for relief is a classic form of retaliation, cloaked in legislative form but unconstitutional in motive.

- **Baseless Inspections and Surveillance:** Immediately following Plaintiff's filing of the LUBA appeal (a protected petition), Defendants Kirkman and Hauther (and their agents) descended on Baller Park for the trio of "inspections" on April 15–17, 2025. These visits had no legitimate regulatory purpose (as evidenced by the absence of citations or any substantive findings) and served only to harass and intimidate. They sent a clear message: if you challenge the City, City officials will come after you and scrutinize you into submission. Such acts would chill an ordinary person from continuing to speak or fight City Hall.

- **Threatening Communications via Landlord:** By contacting Plaintiff's landlord and implying negative consequences for allowing Plaintiff's plans to proceed, Defendants attempted to jeopardize Plaintiff's business tenancy.

This was done shortly after Plaintiff made formal complaints. The clear inference is that Defendants were leveraging whatever means available to retaliate – here, aiming economic pressure at Plaintiff's lease. This kind of indirect interference is an "adverse action" that could dissuade a person of ordinary firmness from continuing to oppose the City.

- **Misrepresenting Plaintiff's Participation to Undermine his Appeal:** Defendant Kirkman's false statement to LUBA (denying that Plaintiff was at the Council hearing) was another retaliatory act – an attempt to get Plaintiff's appeal dismissed on a technicality. Misleading a tribunal to shut down someone's petition for redress is highly retaliatory and egregious.

- **General Hostility and Public Shaming:** In meetings and communications, Defendants Kirkman and Hauther treated Plaintiff with hostility, openly dismissing his concerns. For example, at a May 24, 2025 public "information session" after the appeal was filed, Defendant Kirkman abruptly cut off discussion and tacitly admitted the emergency ordinance was used to beat the referendum clock, before catching herself. This dismissive treatment, combined with the City's narrative casting Plaintiff as simply a code violator, served to isolate and punish him for speaking up.

39. **Causation – Retaliatory Motive:** Plaintiff's protected speech and petitioning were the substantial or motivating factors behind Defendants' adverse actions. The chronology and Defendants' own statements make this clear. Plaintiff's vigorous opposition to the five-cart limit in September 2024

was followed swiftly by Kirkman's and Hauther's escalated pressure (meeting and threats). Plaintiff's outspoken resistance and requests for fairness angered these officials. Then, when Plaintiff exercised his right to appeal to LUBA in April 2025, almost immediately he experienced the consecutive days of surprise inspections and other harassment. Defendant Hauther had even warned Plaintiff earlier that involving lawyers or not "cooperating" would result in the City making things difficult for him – a statement reflecting intent to retaliate. The City's unusual effort to rush an ordinance and then zealously enforce it against Plaintiff, despite prior assurances, also points to retaliatory intent. But for Plaintiff's vocal challenges to their authority, Defendants would likely have handled his situation through normal channels (perhaps allowing more carts or at least negotiating). Instead, because Plaintiff fought back, Defendants set out to teach him a lesson. Internal consistency of their actions with a retaliatory motive is further shown by their disregard of normal procedure. All of these facts support the conclusion that Defendants' campaign of adverse actions was **because of** Plaintiff's First Amendment activities.

40. **Chilling Effect:** Defendants' retaliatory actions would chill a person of ordinary firmness from continuing to engage in protected speech or petitioning. Indeed, the Plaintiff landlord was attacked and has had the chilling effetc intended by Defendants: The project has been lost. the retaliatory visits and pressure caused him significant stress, deterred other

vendors from associating with him (several became hesitant or withdrew, not wanting to be caught in a fight with the City), and made Plaintiff fearful that further activism on his part would only provoke more harm from Tigard officials. The message sent to Plaintiff and others was that using legal processes or speaking out against the City would be met with punitive extra-legal responses. This is precisely the kind of threat to free expression that the First Amendment forbids public officials from conveying. In the Ninth Circuit's words, "public officials may not misuse their power to retaliate against an individual for the individual's exercise of First Amendment rights" – such retaliation itself violates the Constitution. Here, Defendants misused municipal power (permitting authority, inspection power, legislation) to retaliate, which is impermissible.

41. **Violation of First Amendment (Retaliation):** By the above actions, Defendants have violated Plaintiff's First Amendment rights. They intentionally subjected Plaintiff to differential, punitive treatment in response to his protected speech and petitioning. This retaliatory conduct had no legitimate governmental purpose; it was designed to punish Plaintiff for asserting his rights and to deter him (and similarly situated citizens) from further opposition. Under well-established law, such retaliation for protected expression is an actionable First Amendment injury. The fact that Defendants cloaked some retaliatory moves in official forms (like an ordinance or "inspections") does not shield them: what matters is the motive

and effect. Defendants' own admissions and the blatant sequence of events confirm the retaliatory animus. Therefore, Defendants, acting under color of state law, have deprived Plaintiff of his First Amendment rights, giving rise to a claim under § 1983.

42. **Damages:** Plaintiff has suffered significant damages as a result of Defendants' retaliation. These include economic losses (from delayed or lost business opportunities and additional expenses incurred due to Defendants' obstruction), damage to Plaintiff's business reputation and relationships (vendors lost trust, seeing City officials target Plaintiff), and emotional distress (anxiety, humiliation, and frustration from being singled out by those in power). Plaintiff is entitled to compensatory damages for these injuries. He also seeks punitive damages against the individual Defendants, as their retaliatory acts were willful, malicious, or in reckless disregard of Plaintiff's rights – no reasonable official could believe it is lawful to retaliate against someone for filing an appeal or complaining about government misconduct. (Indeed, the right to be free from such retaliation is "clearly established" in the law, removing any possible immunity.) Finally, Plaintiff requests attorney fees and costs under 42 U.S.C. § 1988 should he prevail on this claim.

## Count VI: Municipal Liability (Monell) – 42 U.S.C. § 1983

*(Against Defendant City of Tigard)*

58. Paragraphs 1 through 57 above are re-alleged and incorporated by reference.

59. A municipal entity such as Defendant City of Tigard is liable under 42 U.S.C.

§ 1983 when the deprivation of constitutional rights results from the

municipality's official policy, custom, or practice, or from the actions of

officials with final policymaking authority. In other words, the City can be

held responsible if an official City policy or decision caused the violations, or

if it ratified or deliberately ignored a pattern of unlawful conduct by its

officers that became a de facto policy. This principle originates from *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

60. **Official Policy – Ordinance 25-01:** In this case, many of Plaintiff's

constitutional injuries were caused by an explicit policy of the City: Not just

the enactment of Ordinance 25-01 itself, but a look at the 3 cart rule, shows

the City lacks community participation. The ordinance was a legislative act

by the City Council – the final policymakers for Tigard in matters of

municipal legislation. Defendant Kirkman by the ordinance made herself the

final decision maker while ensuring that any future food cart and food cart

PODs application would severely be limited. By adopting the ordinance

(especially via emergency clause and with knowledge of its retroactive effect

on Plaintiff), the City Council established a City policy to limit food cart pods

to three carts and to apply that limit notwithstanding prior approvals or

investments. This official policy is what directly led to the taking of Plaintiff's

property (Count V) and the violation of his due process rights (Counts I and

II). Under Monell, the City is liable for constitutional harms flowing from its

ordinances and laws. Ordinance 25-01, as applied to Plaintiff, is the moving force behind the taking and the substantive due process violation (being arbitrary and enacted under false pretenses). Thus, the City itself, through its Council's action, bears liability.

61. **Policy or Custom of Retaliation and Unlawful Enforcement:** The First and Fourth Amendment violations (and aspects of the due process violations) stem from the conduct of City officials Kirkman and Hauther. Plaintiff alleges that these officials were not mere rogue actors, but rather were executing City policy or, alternatively, were themselves endowed with final authority in the areas of enforcement they carried out. Several points support the City's liability:

- **Final Policymakers in Departments:** Defendant Kirkman, as Community Development Director, and Defendant Hauther, as Economic Development Director, held high-level roles in Tigard's government structure. On information and belief, Tigard's City Council and City Manager delegated to these officials broad authority over matters like processing (or refusing) development applications, conducting inspections, and managing temporary use permits. In the context of Baller Park, Defendant Kirkman was the ultimate decision-maker on whether Plaintiff's expansion would be allowed under the code (since a Type II decision is made by the Community Development Director). Likewise, Defendant Hauther was effectively the City's voice in dealing with local business development issues like Baller

Park. To the extent they exercised discretion, they did so as *policymakers* for the City in that domain. Therefore, their decisions to retaliate against Plaintiff (e.g., withholding permits, ordering inspections) and to deny him due process (e.g., refusing a hearing or letter of decision) can be attributed to the City. In Monell terms, their actions were "the result of a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (See *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). Tigard is liable for these policy decisions by its senior officials.

• **Ratification by City Council:** Even if Kirkman or Hauther exceeded their authority, the City Council effectively ratified their conduct. The Council was made aware of at least some of the questionable actions – Plaintiff and others brought concerns about the Coercive tactics prior to the ordinance, the fact that between Sept 17th 2024 and Jan. 28th, 2025, Plaintiffs pleadings for help, that he was losing vendors was met with silence. Throughout the process Plaintiff made counsel aware of his ordeal, the  purposeful lack of notice and the mis-application of emergency clauses to the Council's attention (e.g., at the May 2025 forum). Instead of reining in staff, the Council allowed the ordinance to stand and continued to support staff's approach. The City also did not discipline or countermand Kirkman or Hauther after Plaintiff's complaints (including his Tort Claim Notice) outlined their retaliation and misconduct. By failing to correct or disavow the officials' actions, and

continuing to defend the enforcement of the ordinance in LUBA and
elsewhere, the City gave its imprimatur to their conduct. This ratification
cements municipal liability: the unconstitutional actions became, in effect,
the City's actions.

- **Custom or Practice of Abuse of Process:** Furthermore, Plaintiff alleges
  that the City of Tigard has, at least in this instance (and perhaps others), a
  custom of using heavy-handed enforcement tactics when confronted with
  citizen resistance. The coordination between departments to hassle Plaintiff,
  the use of emergency ordinances to circumvent normal process, and the
  targeting of outspoken individuals suggest an ingrained attitude or practice
  tolerated by City leadership. If discovery shows that other developers or
  residents who challenge the City have been similarly treated (e.g., surprise
  inspections, etc.), that would evidence a municipal custom. For now, it is
  alleged that Tigard's leadership was deliberately indifferent to the obvious
  risk that its officials would retaliate or cut corners, effectively encouraging it
  by not implementing safeguards. This deliberate indifference to
  constitutional rights can also ground Monell liability for the City.

- **Failure to Train or Supervise:** Although not separately pleaded as a
  count, it is notable that the City provided no training or guidelines to its
  officials to prevent the kind of conduct at issue. For example, Tigard officials
  seemingly did not receive training that "you cannot conduct warrantless
  inspections without consent" or "you must not retaliate against citizens for

appeals." This failure to train (if proven) reflects the City's policy choice and
can make it liable for the predictable violations that resulted (*City of Canton
v. Harris*, 489 U.S. 378 (1989)). Given how clear some of these constitutional
rules are, the violations by Kirkman and Hauther imply a lack of proper
instruction from the City.

62. **Monell Causation:** The constitutional deprivations suffered by Plaintiff
   were the direct result of the City's official policies or its established
   customs/practices. In summary:

- The **Takings and Due Process violations** were caused by Ordinance 25-01
  (a City policy) and by the emergency enactment process approved by City
  policymakers.

- The **First Amendment retaliation** was carried out by Defendants who had
  policy authority in their realm, and their acts were sanctioned (or not
  repudiated) by the City's highest authorities. The City Council's behavior
  (enacting the ordinance in response to staff's push, ignoring Plaintiff's later
  complaints) demonstrates that the City itself embraced the outcome sought
  by the retaliation – silencing Plaintiff and stopping his project – thus making
  it city policy.

- The **Fourth Amendment violations** similarly stem from how the City, via
  its officials, implemented the ordinance to shudder not only Plaintiff but the
  current and future food carts and food cart PODs in Tigard. Collectively all of
  the Defendants actions were in concert, ignoring the harm caused to the

financial, mental and psychological well being to Plaintiff. Defendant's lack of
a constraint was ratified time and time again by the City Mayor and Council
by not addressing obvious violations and misrepresentations. The city's
actions were consistent and unified which are policy decisions for which the
City is responsible.

- Additionally, the City *ratified* the improper means used by Kirkman and
  Hauther by adopting their ultimate goal (pod limitation) into law and by
  rejecting Plaintiff's administrative appeal (the City formally attempted to get
  LUBA to dismiss Plaintiff's case, essentially endorsing the stance that
  Plaintiff should not be heard).

63. **Liability of City of Tigard:** For the foregoing reasons, the City of Tigard is
    liable under § 1983 for all constitutional violations described in Counts I–V.
    The City's policy or custom was the moving force behind the violations. The
    injuries inflicted on Plaintiff reflect systemic decisions (emergency ordinance,
    enforcement approach) rather than random acts. Under Monell and its
    progeny, the City must answer for the deprivation of Plaintiff's rights caused
    by its ordinance and by its high-ranking officials acting in their official
    capacities.

64. **Damages and Relief:** Plaintiff seeks to hold the City of Tigard jointly and
    severally liable for the compensatory damages due to him for the violations of
    his constitutional rights. These damages (outlined in preceding counts)
    include economic losses (takings and business losses), and emotional and

intangible harms (from the due process, First Amendment, and Fourth Amendment violations). Plaintiff also seeks injunctive and declaratory relief against the City to prevent further enforcement of the unconstitutional policies (especially Ordinance 25-01) and to mandate non-retaliation. Because the City is liable, it is responsible for ensuring full relief is afforded. Moreover, pursuant to 42 U.S.C. § 1988, the City must pay Plaintiff's attorney fees and costs if he prevails, since the City's actions necessitated this suit. Liability against the City is critical also because some forms of relief (e.g., reversing the ordinance's application, paying just compensation) can only be effectively provided by the municipal entity.

65. In sum, the City of Tigard, through its Council and its final policymakers, instituted and carried out an official policy that violated Plaintiff's constitutional rights, or in the alternative, allowed an unofficial custom of unconstitutional conduct to flourish, causing Plaintiff's injuries. Accordingly, the City is liable under Monell and § 1983.

## Injuries and Damages

66. Plaintiff incorporates by reference the allegations of harm set forth in each of the above Counts. In aggregate, the actions of Defendants have caused Plaintiff extensive injuries, which can be summarized (but not limited to) as follows:

- **Economic Losses:** Plaintiff has suffered monetary losses exceeding $2,500,000. This includes the loss of his anticipated equity in the property (because the project became non-viable and the option to purchase lost its value), lost and/or diminished revenue from food cart tenant rents (Plaintiff had projected significant income from hosting up to 20 carts, which now is capped at a fraction of that), lost business opportunities (such as expansion to related ventures or attracting additional investors, foreclosed by the ordinance), and out-of-pocket costs thrown away on site improvements, planning, and preparation for a larger pod that can no longer materialize. These economic injuries are concrete and were directly caused by Defendants' conduct (for example, vendors and lenders pulled back once the City's stance became clear, and Plaintiff's cash flow shrank under the cart limit).

- **Deprivation of Property Rights:** Plaintiff has been deprived of fundamental property rights, including the right to use and enjoy his leasehold as intended, the right to develop the property consistent with his vested expectations, and the contractual rights he had negotiated (with the landlord and with vendors). The ordinance and Defendants' actions interfered with Plaintiff's reasonable, investment-backed expectations (as discussed), effectively stripping him of the core benefits of his agreements. This deprivation is ongoing: as long as Ordinance 25-01 is enforced against him, Plaintiff cannot make full use of the property or realize his contractual bargains. In essence, a substantial portion of Plaintiff's property interest has

been rendered **idle or useless** to him, which is a harm compensable under
the law.

- **Reputational and Business Goodwill Harm:** Defendants' treatment of
  Plaintiff (painting him as non-compliant, subjecting his business to sudden
  rule changes and inspections) has damaged Plaintiff's reputation in the
  community and among the network of food cart operators. Some vendors who
  were interested in locating at Baller Park have lost confidence in Plaintiff's
  venture (viewing it as troubled or stymied by City opposition). Plaintiff's
  relationships with existing vendors were also strained; some carts left or
  scaled down because of the uncertainty and pressure. The goodwill Plaintiff
  had built for Baller Park as an up-and-coming food cart destination was
  severely undermined by Defendants' actions. In the tight-knit business
  community, word spreads quickly, and the City's public stance effectively
  branded Baller Park as non-viable, causing reputational injury to Plaintiff as
  an operator.

- **Emotional Distress:** Plaintiff has endured significant emotional distress,
  including stress, anxiety, and a sense of injustice, as a result of Defendants'
  conduct. He invested not just money but personal passion into Baller Park,
  and to see it sabotaged by those wielding government power has been
  extremely distressing. The retaliatory acts (like the drive-by inspections and
  landlord contact) caused Plaintiff to fear what the City might do next, leading
  to sleeplessness and worry for his financial future. The ordeal has been

humiliating as well: Plaintiff had to watch City officials mischaracterize him

and effectively shut him down, which took a psychological toll. While

emotional distress may be intangible, it is a real damage suffered and

recoverable under § 1983 (particularly for the First Amendment and due

process claims).

- **Chill of Constitutional Rights:** There has been a specific injury to

  Plaintiff's First Amendment interests. The retaliation he faced chilled his

  willingness (and perhaps that of others who observed his case) to exercise

  free speech and petition rights. Plaintiff has become more cautious and

  fearful about speaking at City meetings or filing complaints, because he now

  reasonably anticipates retribution. This chilling effect is itself an injury, as it

  deprives Plaintiff of the full liberty to advocate for his rights and participate

  in civic processes without fear. Restoring his rights via this lawsuit is part of

  redressing that injury.

67. All of the above injuries were the natural, proximate, and foreseeable result

of Defendants' unlawful actions. Indeed, in many respects Defendants

intended these consequences (e.g., they intended to economically harm

Plaintiff to drive him out of business and intended to cause him emotional

discomfort to deter his protests). Plaintiff has mitigated his damages where

possible – for instance, he kept operating the 3-cart pod to generate some

revenue and pursued less effective remedies like the LUBA appeal – but

those efforts cannot undo the harm already done or fully compensate his
losses.

68. Accordingly, Plaintiff seeks a full recovery of damages from Defendants, in
amounts to be determined at trial. These include but are not limited to:
compensation for lost profits and business value, compensation for the
diminution in property/lease/option value, restitution of out-of-pocket
expenditures made futile, damages for the violation of Plaintiff's
constitutional rights and the consequent emotional distress and personal
indignity, and punitive damages against the individual Defendants to punish
and deter willful misconduct. Plaintiff also seeks declaratory and injunctive
relief to prevent ongoing and future harm, as well as an award of attorneys'
fees and costs to partially ameliorate the financial burden he has incurred to
vindicate his rights.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in his
favor and grant the following relief:

### A. Compensatory Damages

6. An award of compensatory damages against all Defendants, jointly and severally,
in an amount to fully compensate Plaintiff for the economic losses he has sustained.
This amount is presently estimated to exceed $2,500,000, and includes (but is not
limited to) lost profits and income from the reduction of the pod from 20 carts to 3

carts, the loss of value of Plaintiff's leasehold and purchase option, the loss of investments made in anticipation of a larger development, and other financial harm directly resulting from Defendants' conduct.

7. An award of compensatory damages for non-economic harm, including Plaintiff's reputational damage, loss of goodwill in his business, and mental and emotional distress (such as anxiety, frustration, and humiliation) caused by Defendants' unconstitutional actions. While specific proof of amount will be submitted to the jury, Plaintiff suggests this fall in an amount deemed just by the jury to compensate for the intangible injuries suffered.

## B. Punitive Damages

8. An award of punitive (exemplary) damages against the individual Defendants **Sambo Kirkman and Danelle Hauther** in their personal capacities. Plaintiff requests punitive damages in an amount sufficient to punish these Defendants for their willful, malicious, and/or reckless disregard of Plaintiff's constitutional rights, and to deter similar misconduct by public officials in the future. (As a municipal entity, the City of Tigard is not sued for punitive damages per federal law, so this subparagraph applies only to Kirkman and Hauther individually.)

## C. Nominal Damages (If Applicable)

9. In the alternative, if the Court or jury finds that Plaintiff's actual compensatory damages are not quantifiable or that constitutional violations occurred without a large proven monetary loss, Plaintiff seeks nominal damages (e.g., $1) for each violation, to vindicate the deprivation of his rights. (This request is chiefly to ensure

that a technical finding of a violation, even with minimal damages, entitles Plaintiff to prevailing party status and associated relief.)

### E. Attorney's Fees and Costs

10. An award of Plaintiff's reasonable attorney's fees and litigation costs, including expert witness fees, pursuant to 42 U.S.C. § 1988 and any other applicable provision, given that Plaintiff's action is to enforce civil rights under § 1983. Plaintiff also seeks costs and disbursements as allowed by law. If Plaintiff proceeds pro se for any period, he reserves the right to seek allowable costs and, if applicable, law library or research costs.

### E. Further Relief as Justice Requires

11. Such other and further relief as the Court deems just and proper, including but not limited to pre-judgment and post-judgment interest on any monetary award, and any necessary orders to enforce the declaratory or injunctive relief above (such as court supervision or a requirement that the City expunge any enforcement records related to the ordinance's application to Plaintiff).

**Jury Demand:** Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to the Seventh Amendment to the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure.

**Verification:**

I, Ky Le, am the Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Second Amended Complaint and that the factual allegations therein are true and correct to the best of my knowledge, information, and belief.

Executed on October 19th, 2025,

_____/s/ Ky le_____

Ky Le
Self Represented

---

**Jury Demand**

Plaintiff hereby demands a trial by jury on all issues so triable.

---

**DECLARATION UNDER PENALTY OF PERJURY**

The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint, and that the information contained therein is true and correct. 28 U.S.C. §1746; 18 U.S.C §1621.

Executed onExecuted on October 19th, 2025,  , 2025 in the State of Oregon.

_____/s/ Ky le_____

Ky Le
Self Represented